**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ralph Nader, et al., ) | No. CV-04-1699-PHX-FJM |
| ) | |
| Plaintiffs, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Janice Brewer, in her official capacity of ) | |
| Secretary of State, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

The court has before it defendant's Motion for Summary Judgment (doc. 45), plaintiffs' Motion for Summary Judgment (doc. 47) and Memorandum (doc. 56), defendant's Response (doc. 49) and Reply (doc. 55), and plaintiffs' Response and Reply (doc. 51).

**I**

Ralph Nader, an independent candidate for President in 2004, and Donald Daien, a registered Arizona voter who supported Nader, brought this action alleging that Arizona's ballot access statutes deprive them of their First and Fourteenth Amendment rights to free speech and association. Nader announced his candidacy on February 22, 2004. On June 9, 2004, he filed nomination petitions with the Secretary of State of Arizona, containing approximately 21,185 signatures. Thereafter, two voters filed an action in the Superior Court of Arizona in Maricopa County, challenging Nader's eligibility for the ballot on the basis that Nader failed to file a sufficient number of valid signatures, Nader's petitions included

forgeries by circulators, some of Nader's petitions were circulated by felons, and certain circulators falsified their addresses. At the time set for trial, Nader advised the court that he was withdrawing his petitions and his candidacy in Arizona because he failed to collect enough valid signatures. Based on Nader's statement, the superior court entered judgment enjoining the Secretary of State and county election officials from placing Nader and his electors on the ballot.

Plaintiffs then brought this action challenging Arizona's election statutes as unconstitutional. We denied plaintiffs' application for preliminary injunctive relief and the election was held without Nader. Plaintiffs now seek declaratory relief that Arizona election laws are unconstitutional to the extent that they (1) require those who circulate nomination petitions on behalf of presidential candidates to be qualified to vote in Arizona, and (2) impose an early deadline for filing nomination petitions far in advance of either party's national convention.[1]

Independent candidates for public office may get on the ballot in Arizona by filing nomination petitions containing a requisite number of signatures. A.R.S. § 16-341. In a national presidential election, the petitions are filed for the office of presidential elector, rather than for the candidate. Id. at § 16-341(G). The number of signatures required for an independent presidential candidate to get on the ballot is 3% of registered voters who are not registered as members of a recognized political party. A.R.S. § 16-341(E). In 2004, 14,694 signatures were required. Nomination papers for all candidates for presidential elector, whether they represent a candidate from a recognized party or an independent candidate, are due no fewer than 90 days before the primary election. A.R.S. §§ 16-311(A), 16-341(C). In 2004, the filing deadline was June 9, 2004. Arizona law also provides that any person

---

[1] Our resolution of these issues is made on a very limited record. Plaintiffs did not file a statement of facts, but instead chose to rely on the State's submission. Plaintiffs offered no evidence to establish the significance of the burden imposed on them by the challenged statutes.

- 2 -

1  who is "qualified to register to vote" in Arizona may circulate nomination petitions. A.R.S.
2  §§ 16-315(B), 16-321(D).

## II

### A

Defendant contends that we should dismiss for lack of standing and mootness. Parties seeking to invoke the jurisdiction of federal courts must show that they have standing to sue within the meaning of Article III. Standing has essentially three components: a plaintiff must show that he has suffered an "injury in fact," that the challenged action caused the injury, and that the injury can likely be redressed by the cause of action. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992). Nader contends that his First Amendment rights to free speech and free association are violated by A.R.S. §§ 16-315(B) and 16-321(D), which prohibit him from circulating petitions in Arizona because he is not an Arizona resident. Plaintiffs contend that their vote, and their associational and speech rights, are diminished by the limits imposed on ballot choices caused by early filing deadlines. Because the "injury in fact," causation, and redressibility components were satisfied, plaintiffs had standing to bring this action.

Although the election was held without Nader's name on the ballot, the passage of an election does not necessarily render an election-related challenge moot. Such challenges may fall within the "capable of repetition yet evading review" exception to the mootness doctrine. See Moore v. Ogilvie, 394 U.S. 814, 816, 89 S. Ct. 1493, 1494 (1969). Where there is a challenge to the validity of a statutory provision that will continue to operate past the election in question and will burden future candidates or voters in future elections, a "continuing controversy" remains. Id. "[T]he laws in question remain on the books, and [plaintiff] has standing to challenge them as a member of the class of people affected by the presently written statute." Schaefer v. Townsend, 215 F.3d 1031, 1033 (9th Cir. 2000) (quoting Dunn v. Blumstein, 405 U.S. 330, 333 n.2, 92 S. Ct. 995, 998 n.2 (1972)). Because the statutes remain unchanged, this case is capable of repetition. And given the very tight time deadlines

imposed by state election law on challenges to nomination petitions, see A.R.S. § 16-351, this case may yet evade review. The action, thus, is not moot.

### B

Each provision of a state's election code inevitably affects the right of association and the right to vote. Anderson v. Celebreeze, 450 U.S. 780, 788, 103 S. Ct. 1564, 1569-70 (1983). However, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Id. (quoting Storer v. Brown, 415 U.S. 724, 730, 94 S. Ct. 1274, 1279 (1974)). Associating for the purpose of placing a candidate on the ballot is protected by the First Amendment; indeed, the circulation of petitions for ballot access "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.' " Meyer v. Grant, 486 U.S. 414, 421-22, 108 S. Ct. 1886, 1892 (1988).

In evaluating the constitutionality of ballot access regulations, a court must carefully weigh competing factors.

> It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights.

Anderson, 450 U.S. at 789, 103 S. Ct. at 1570.

A law that severely restricts First Amendment rights will pass muster only if it is narrowly tailored to achieve a compelling state interest. Libertarian Party v. Munro, 31 F.3d 759, 761 (9th Cir. 1994) (citing Burdick v. Takushi, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063 (1992)). If the burden is slight, however, the procedures will survive as long as they are rationally related to a legitimate interest. Id. In evaluating the nature and magnitude of the burden that Arizona's election procedures impose on independent candidates, we must examine the entire regulatory scheme. Id. at 761-62. From that vantage, "[t]he question is whether 'reasonably diligent' [independent] candidates can normally gain a place on the

- 4 -

ballot, or if instead they only rarely will succeed." Id. at 762 (quoting Storer, 415 U.S. at 742, 94 S. Ct. at 1285). Plaintiffs have the burden of showing that the challenged laws "seriously restrict the availability of political opportunity." Id.

**1.**

Plaintiffs first challenge the constitutionality of A.R.S. §§ 16-315(B) and 16-321(D), which provide that those who circulate nomination petitions on behalf of political candidates must "be qualified to register to vote" in Arizona.[2] A person is qualified to register to vote if he or she is an Arizona resident, a United States citizen, at least 18 years old by the next general election, not a convicted felon, and an Arizona resident at least 29 days before the election. A.R.S. § 16-101.

Plaintiffs' challenge centers on the requirement that circulators must be Arizona residents. They contend that the residency requirement restricts political expression by limiting the number of voices available to convey their message, and therefore limits the size of the audience they can reach. Moreover, the restriction makes it less likely that an independent candidate will gather the signatures required to get on the ballot, thus limiting the ability to influence public political discussion. Plaintiffs also argue that their First Amendment right to political and expressive association is violated because they are not able to advocate or vote for the candidates they support.

A state has a compelling interest in protecting the integrity and fairness of the electoral process and in "ensuring that an individual's right to vote is not undermined by fraud in the election process." Burson v. Freeman, 504 U.S. 191, 199, 112 S. Ct. 1846, 1852 (1992). Here, the State asserts that "[b]y requiring circulators to be Arizona residents, [it] may locate and subpoena circulators to answers questions or, in the event of fraud, to enforce its laws." Defendant's Motion for Summary Judgment at 15. The State contends that a

---

[2]While the Supreme Court has struck down actual voter registration as a requirement to circulate petitions, it had no occasion to address residence requirements. Buckley v. American Constitutional Law Found., Inc., 525 U.S. 182, 119 S. Ct. 6361 (1999).

1 history of circulator fraud in Arizona elections shows the necessity of the residency
2 requirement. DSOF ¶ 44.

3 Arizona has an expedited process to challenge nomination petitions. First, an elector
4 must file an action within 10 days of the petition filing deadline. A.R.S. § 16-351(A). The
5 candidate benefits from a presumption that the petitions are valid because the circulator
6 attests to the validity of each signature. Arizona places the burden on the challenging party
7 to identify by petition number and by line each signature alleged to be invalid and to assert
8 the basis for the challenge. Id. In order to effectively identify and support petition
9 challenges, an elector may be required to identify and locate circulators, and secure their
10 testimony. Failure to adequately specify the basis for the challenge will result in the
11 dismissal of the action. Id.

12 According to the State, identifying issues, locating circulators and securing their
13 testimony in just 10 days would be virtually impossible if circulators could not be readily
14 located and made available to testify, particularly given that professional circulators
15 oftentimes operate as "migratory workers," leaving the state as soon as the petition drive is
16 completed. See McDowell Mountain Ranch Land Coalition v. Vizcaino, 190 Ariz. 1, 4, 945
17 P.2d 312, 315 (1997).[3]

18 We agree that the State has a compelling interest in protecting the petition process
19 from fraud and abuse, and to ensure the State's subpoena power in order to accomplish these
20 goals. Under Arizona's statutory framework, an elector would be hard pressed to raise an
21 effective challenge to a nomination petition without access to the person who collected the
22 contested signatures. Given the fact that independent candidates have access to
23 approximately 3.7 millions Arizona residents who are eligible to circulate petitions, DSOF
24 ¶ 7, any interference with plaintiffs' right to political expression is limited and justified by
25 the State's compelling interest in protecting the integrity of the election process.

---

[3] The Nader campaign contracted with JSM, Inc., a Florida corporation, to circulate petitions in Arizona. DSOF, Exhibit 8.

1    Plaintiffs argue that Arizona's statutory scheme is not narrowly tailored to satisfy the State's interests. Plaintiffs claim that because § 16-101(A)(3) only requires residency 29 days before an election, a circulator need not be a resident at the time of a petition drive, thereby defeating the State's interests in ensuring subpoena power at the time of a petition challenge. But plaintiffs ignore the introductory sentence of A.R.S. § 16-101(A), which provides that, "[e]very resident of the state is qualified to vote if . . . ." (Emphasis added). The first qualification for voter eligibility under § 16-101(A) is that a person be a "resident." Subparagraph (3) imposes the additional requirement that a resident must have been a resident for 29 days before the election. A person must be an Arizona resident at the time of the petition drive in order to circulate a petition.

We conclude that Arizona's circulator residency requirement does not violate plaintiffs' First Amendment rights. The harm to plaintiffs' rights is minimal, if at all, while the State's interest in the integrity of the process is substantial.

**2.**

Plaintiffs next challenge statutes that require nomination petitions of independent candidates to be filed not less than 90 days before the primary election. See A.R.S. §§ 16-341(C), 16-311(A). In 2004, the filing deadline was June 9th. Plaintiffs contend that this deadline discriminates against independent candidates who are required to identify themselves and file nomination petitions before the major political parties have chosen their candidates for the general election. They argue that Arizona's June 9th filing deadline imposes an unconstitutional burden on the speech and associational rights of independent candidates and voters who might support them.

In Anderson, the Supreme Court found a mid-March filing deadline unconstitutional because it could not be justified by the state's asserted interest in protecting political stability. 450 U.S. 780, 805-06, 103 S. Ct. 1564, 1579 (1983). The Court examined the burdens imposed on speech and associational rights by an early filing deadline, and noted that issues and candidates do not remain static over the course of an election campaign. Id. at 790, 103 S. Ct. at 1570. Imposing an early filing deadline deprives alternative political parties of the

1  opportunity to recruit and nominate candidates, and deprives them of the ability to react to
2  events occurring after the filing deadline.  An early filing deadline may require candidates
3  to gather signatures at a time when the election is remote and voters are generally
4  uninterested in the campaign.  Id. at 792, 103 S. Ct. at 1572.

5        Given these burdens on plaintiffs' rights, we now turn to the State's justifications for
6  its filing deadline.  The State contends that adequate time must be available between the
7  petition deadline and the general election to allow challenges to the validity of petitions to
8  be raised and adjudicated.  The State contends that the deadline is necessary to allow
9  sufficient time to print and distribute ballots that will contain the names of all the candidates.
10 The ballots must be printed well before the general election so that they can be distributed
11 to registered voters who vote by absentee or early ballot.

12       In 2004, Arizona's filing deadline fell only 146 days before the general election–83
13 days closer than the deadline in Anderson.  Early voting begins in Arizona 33 days before
14 the general election, A.R.S. § 16-545, and ballots must be mailed to members of military
15 overseas at least 45 days before the election. With early voting, the period between Arizona's
16 filing deadline and the date voting begins is only 113 days–less than half the period
17 considered in Anderson.  After the filing deadline and during this 113-day period, Arizona
18 law provides for challenges to a candidate's petitions or his qualifications for office.  A.R.S.
19 § 16-351.  This challenge process must be completed before ballots can be printed.

20       The State asserts that the presidential primary process has changed since Anderson
21 was decided more than 20 years ago.  In 2004, ten states held their primary elections on
22 "Super Tuesday," which fell on March 2nd.  Arizona's presidential preference election was
23 held on February 3rd, well before the June filing deadline.  As the Seventh Circuit noted with
24 respect to the 2004 election, "[l]ong before the June deadline it was not only certain who the
25 major parties' candidates would be but their positions were well known, the candidates were
26 campaigning vigorously, there was a high level of public interest in the campaign, [and]
27 Nader himself had been campaigning since February."  Nader v. Keith, 385 F.3d 729, 736
28

(7th Cir. 2004). Thus, many of the concerns raised in Anderson do not have the same significance today.

Here, Nader declared his candidacy on February 22, 2004, giving him 107 days to collect the requisite number of signatures. Yet Nader did not begin circulating petitions until April, and waited until just two weeks before the deadline to collect more than 90 percent of his signatures. "The question is whether 'reasonably diligent' minor party candidates can normally gain a place on the ballot, or if instead they only rarely will succeed." Libertarian Party v. Munro, 31 F.3d at 762 (citing Storer, 415 U.S. at 742, 94 S. Ct. at 1285). Nader's failure to get on the ballot was caused by his failure to start earlier.

We conclude that Arizona's filing deadline is not more burdensome than necessary to support its compelling interests in allowing sufficient time to verify signatures, allow for challenges to petitions, and to print and distribute ballots for early and oversees voting. It is thus constitutional.[4]

### III

**IT IS ORDERED GRANTING** defendant's Motion for Summary Judgment (doc. 45). **IT IS FURTHER ORDERED DENYING** plaintiffs' Motion for Summary Judgment (doc. 47).

DATED this 8th day of June, 2006.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge

---

[4]We note in passing that the Arizona Supreme Court reached the same conclusion. See Browne v. Bayless, 202 Ariz. 405, 46 P.3d 416 (2002), cert. denied, 537 U.S. 1088, 123 S. Ct. 696 (2002).